[Cite as *State v. Willan*, 2011-Ohio-6603.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 24894 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DAVID WILLAN | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2007-12-4233 (A) |

DECISION AND JOURNAL ENTRY

Dated: December 21, 2011

BELFANCE, Judge.

{¶1} Appellant, David Willan, appeals from his convictions of multiple offenses in the Summit County Court of Common Pleas. For the reasons that follow, we affirm Mr. Willan's convictions of three counts of false representation in the registration of securities, and one count each of engaging in a pattern of corrupt activity, tampering with records, and falsification, but reverse the remainder of his convictions.

BACKGROUND

{¶2} All of Mr. Willan's convictions stem from activity conducted by two of his businesses between 2002 and 2007. For several years, Mr. Willan was in the business of buying, renovating, and reselling homes under the name of Summit Redevelopment, a business he owned with a partner. Mr. Willan later bought the partner's interest and changed the company's name to Evergreen Homes, LLC. Although Mr. Willan later started building new homes through a business named Evergreen Builders, that entity is not connected to the convictions in this case.

Because many potential buyers of renovated homes lacked the ability to secure financing through traditional means, Summit Redevelopment and later Evergreen Homes assisted buyers in obtaining financing. Specifically at issue in this case, Evergreen Homes helped some of its homebuyers secure a first mortgage for approximately 80 percent of the purchase price and allowed the buyer to pay off the remaining balance over time. To secure its right to receive payment of the remaining 20 percent balance, Evergreen Homes retained a second mortgage on each of these properties.

{¶3} As Evergreen Homes' sales business grew, it developed a need for an influx of capital. By allowing the buyers to pay off 20 percent of the purchase price over time, Evergreen Homes received most of its profit from its home sales over time, as each home buyer paid the remaining 20 percent owed. Thus, Evergreen Homes' assets consisted, in part, of notes receivable. Although Evergreen Homes' assets were growing, it lacked the liquid funds it needed to purchase and renovate more homes. Mr. Willan hired an experienced partner in the regulatory and finance practice group of a reputable local law firm. He worked with attorneys at the firm for almost a year to develop a business plan to raise capital for Evergreen Homes. Mr. Willan continued to work with these attorneys for the next several years and repeatedly told them that he wanted to do whatever was necessary to ensure that his business complied with the law. Even when the law firm recommended action that exceeded that required under the law, Mr. Willan readily agreed to the firm's recommendations.

{¶4} To implement the business plan, Mr. Willan formed a separate company, Evergreen Investment Corporation. Evergreen Investment was formed to purchase and hold the second mortgages that Evergreen Homes had received through its home sales and to secure investors to provide capital that would enable it to purchase the mortgages from Evergreen

Homes. To accomplish this goal, Evergreen Investment sold debt securities, which earned interest at a set rate around 10 percent or above. This endeavor required Evergreen Investment to conform to the registration requirements connected with a securities offering. Eventually, Evergreen Homes secured capital directly through the sale of equity securities. These securities represented actual ownership interests in Evergreen Homes.

{¶5} In raising its capital through the issuance of debt securities, Evergreen Investment registered each offering with the Division of Securities of the Ohio Department of Commerce. Upon the advice of counsel, Mr. Willan hired a certified public accounting firm to prepare audited financial statements for Evergreen Investment to file with the Division prior to the initial offering. Although audited financials were not required by the Division, Mr. Willan followed his counsel's advice to fully disclose the financial condition of the company. With respect to the sale of its equity securities, Evergreen Homes did not register those securities with the Division of Securities, but instead filed forms with the Division to exempt the offerings of those securities from the state's registration requirements.

{¶6} Mr. Willan hired Daniel Mohler in early 2003 to sell homes for Evergreen Homes, but later asked him to manage the investment sales. Mohler had no experience with securities sales and was not licensed by the state to sell securities. It is not clear from the record exactly when Mohler began selling the securities or whether Mr. Willan might have handled the securities sales prior to Mohler. By the end of 2004, however, Mohler was the only person selling securities for the Evergreen companies. With the exception of a brief period of time during 2006 that he was paid a salary, Mohler received a commission for each security sale. Although Mohler eventually sold securities for both Evergreen Investment and Evergreen

Homes, the only sales offenses at issue in this case involve his sale of debt securities for Evergreen Investment.

{¶7} Evergreen Investment sold its debt securities through newspaper advertisements, which were approved by the Division prior to publication. The ads announced the availability of the high-risk, high-yield certificates and provided information about how prospective investors could obtain more information about the offering. The sales strategy was relatively simple: interested investors would be enticed by the ads to contact Evergreen Investment to request an offering circular and subscription agreement. The information provided warned the potential investor that the investment was high-risk, was dependent on fluctuations in the lending and housing market, and was not insured. After reviewing the information and determining whether the investment was appropriate, interested investors would purchase certificates. The certificates stated that the investments were unconditionally guaranteed by Evergreen Homes. Even though the investment was tied to the continued success of Evergreen Homes, numerous investors were attracted to the high rate of return and good reputation of the company. Mohler's job was to handle the paperwork when potential investors contacted the office. Although he occasionally met outside the office with potential investors who requested information, Mohler's sales role did not involve the active solicitation of new investors. Thus, Mohler was not the stereotypical salesman.

{¶8} During May 2006, when the Division conducted an audit of Mr. Willan's companies, it learned that Mohler was selling the securities and was receiving a commission for each sale. Both Mr. Willan and Mohler openly admitted that Mohler received a commission for each security sale. In fact, Mr. Willan made no attempt to conceal anything about his businesses during the audit, nor did he attempt to alter the companies' books to disguise the form or amount

of Mohler's compensation. Mr. Willan stated that he was not aware that he should not have been paying Mohler a commission. The Division described Mr. Willan as "fully cooperative" with its investigation. In furtherance of his cooperation, Mr. Willan agreed to travel to Columbus to give a deposition to the Division. There is no evidence suggesting that Mr. Willan did anything to impair or hinder the Division's investigation.

{¶9} Discovering that commissions were being paid in connection with each security sale was significant to the Division because, among other things, it felt that fact had been misrepresented on some of the securities filings. The Division also took the position that the payment of commissions to Mohler triggered the need for him to be licensed as a salesperson under Ohio law. The Division communicated with Mr. Willan's then-counsel, who had been unaware until that time that Mohler was selling the securities or that anyone was receiving commissions. After learning that Mohler was paid commissions to sell the securities, Mr. Willan's counsel informed the Division that Ohio law did not require Mohler to be licensed as a salesperson because he sold securities on behalf of the issuer, and therefore, the sales were exempted from state licensing requirements. Based on his counsel's advice, Mr. Willan maintained the position that the statutory prohibition on commissioned sales applied only to securities dealers, not salespeople. Nonetheless, in what appears to be an abundance of caution, Mr. Willan's counsel advised Mr. Willan to stop paying Mohler a commission and suggested that instead Mohler be paid a salary. Mr. Willan agreed. It appears that Mr. Willan's counsel believed that such action would be sufficient to resolve the matter with the Division.

{¶10} In addition to concerns of the Division of Securities that Evergreen Investment and Evergreen Homes were conducting business in violation of Ohio securities laws, the Summit County Sheriff's Department had become aware that many of the homes sold by Mr. Willan

were in foreclosure. The sheriff's department had been investigating Mr. Willan and his businesses and had learned that he had withdrawn large sums of money from his companies. It questioned whether these withdrawals had been made at the expense of investors and whether Evergreen Investment was financially solvent. The sheriff's department obtained warrants to search the offices of the Evergreen companies as well as Mr. Willan's current and former residences. On June 19, 2006, the sheriff's department seized numerous items from Mr. Willan's offices that included several computers and file cabinets full of business records of Evergreen Homes and Evergreen Investment. The Evergreen companies were "basically left with a shell of an office." It does not appear that any evidence was uncovered during the raid that would suggest that the purpose of Mr. Willan's endeavors was to defraud investors in the nature of a "Ponzi" scheme or that the entities were not legitimate operations.

{¶11} When an attorney at the Division of Securities first began investigating the Evergreen companies in March 2006, he discovered that the Division had received no complaints from any investors in either Evergreen company. Prior to the raid by the sheriff's department, all investors were paid everything they had been promised, and Evergreen Investment had honored all requests for redemption of certificates. After the raid, however, the Evergreen companies essentially screeched to a halt. The companies had little ability to continue operations because the sheriff's department had seized their computers and business records. Moreover, because the raid had generated a great deal of negative publicity, investors called to demand an immediate return of their investments and potential home sales customers apparently stopped doing business with the Evergreen companies. Although Mr. Willan's companies remained financially solvent with more than sufficient assets to cover the investments, because the bulk of the assets consisted of notes receivable and unsold homes, Mr. Willan lacked the liquidity to refund the investments

of everyone at once. Although no details are set forth in the record, at some point, Mr. Willan's Evergreen companies filed for bankruptcy protection.

{¶12} On December 19, 2007, Mr. Willan and many other co-defendants were charged in a 147-count secret indictment. Mr. Willan, the primary defendant who initially faced 108 charges, was tried separately from his co-defendants and the charges against him were severed into two jury trials. The trial judge granted a judgment of acquittal on many of the charges against Mr. Willan before and during the first jury trial, which commenced on November 17, 2008. After the close of evidence, the jury considered 68 counts against Mr. Willan: one count of engaging in a pattern of corrupt activity, five counts of false representation in the registration of securities, 20 counts of selling securities as an unlicensed dealer, one count of securities fraud, one count of aggravated theft, one count of theft from the elderly, 17 counts of violating the Ohio Small Loans Act, and 22 counts of acting as an unregistered second mortgage lender. The jury found Mr. Willan guilty of all 68 counts.

{¶13} On May 18, 2009, Mr. Willan's second trial began on the remaining nine counts in the indictment: one count of grand theft, six counts of money laundering, one count of tampering with records, and one count of falsification. The trial court granted a judgment of acquittal on the charge of grand theft and on five of the six counts of money laundering. The jury acquitted Mr. Willan of the remaining count of money laundering, but convicted him of one count of tampering with records and one count of falsification. He appeals from his convictions from both trials and raises six assignments of error.

SUFFICIENCY OF THE EVIDENCE

{¶14} Mr. Willan's first assignment of error is that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. "'Inasmuch as a

court cannot weigh the evidence unless there is evidence to weigh,' this Court will consider his sufficiency argument before analyzing his argument regarding the manifest weight of the evidence." *State v. Rucker*, 9th Dist. No. 25081, 2010-Ohio-3005, at ¶8, quoting *Whitaker v. M.T. Auto. Inc.,* 9th Dist. No. 21836, 2007-Ohio-7057, at ¶13. Moreover, although Mr. Willan purports to raise a manifest weight challenge, his arguments do not focus on the weight of the evidence before the trial court. Because Mr. Willan's arguments are confined to the sufficiency of the evidence supporting his convictions, this Court will limit its review accordingly.

{¶15} For the most part, the evidence presented by the State was not disputed by Mr. Willan. Although Mr. Willan presented witnesses on his own behalf at the first trial, his witnesses did not dispute the evidence that was already before the trial court but offered testimony to support his legal argument that his conduct, as demonstrated by the State, did not constitute the offenses for which he was charged. In fact, some of the witnesses called by the State provided testimony that supported Mr. Willan's position. This Court's review of the sufficiency of evidence supporting a conviction is a question of law that this Court reviews de novo. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386. This Court must determine whether, viewing the evidence in a light most favorable to the prosecution, it could have convinced any rational trier of fact of Mr. Willan's guilt beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.

### Mr. Willan's First Trial

{¶16} Because Mr. Willan's convictions resulted from two separate jury trials, this Court will review the evidence presented at each trial separately. Mr. Willan's convictions following the first trial fall into two main categories: (1) licensing or registration offenses, based on the State's allegation that Mr. Willan, through Evergreen Homes and/or Evergreen

Investment, engaged in certain business practices without registering with the state or obtaining a state license; and (2) misrepresentation offenses, based on misrepresentations by Mr. Willan that no commissions would be paid in connection with the sale of Evergreen's securities. Mr. Willan's challenges to the sufficiency of the evidence supporting his convictions will be organized accordingly.

**Licensing/Registration Offenses**

{¶17} Mr. Willan was convicted of engaging in the following business without obtaining a license or certificate of registration from the state: (1) selling securities; (2) issuing second mortgages; and (3) issuing small loans. Mr. Willan does not dispute that he conducted these types of activities or that he did so without obtaining a license or registration from the state. Instead, he argues that his business activities did not fall within the meaning of the applicable licensing or registration statutes.

Sale of Securities

{¶18} The most serious of Mr. Willan's licensing convictions were 20 counts of violating R.C. 1707.44(A)(1) by selling securities without obtaining a license. Although both Evergreen Investment and Evergreen Homes eventually sold securities, the indictment and Mr. Willan's convictions pertained only to specific sales of Evergreen Investment debt securities. The State attempted to prove that Mr. Willan violated R.C. 1707.44(A)(1) by acting through Daniel Mohler in selling securities because Mohler was not licensed to sell securities, nor was Mr. Willan or either of his companies.

{¶19} At all times relevant in the indictment, R.C. 1707.44(A)(1) provided that "[n]o person shall engage in any act or practice that violates division (A), (B), or (C), of Section 1707.14 of the Revised Code, and no salesperson shall sell securities in this state without being

licensed pursuant to section 1707.16 of the Revised Code." Divisions (A), (B), and (C) of R.C. 1707.14 regulate the licensing and registration of dealers. R.C. 1707.01(F)(1) defines a "salesperson" as "every natural person, other than a dealer, who is employed, authorized, or appointed by a dealer to sell securities within this state." Thus, if Mr. Willan, Evergreen Investment, and Evergreen Homes were not dealers, Mohler could not be a salesperson. See R.C. 1707.01(F)(1). The basic definition of "dealer," set forth in R.C. 1707.01(E)(1), includes:

> "every person, other than a salesperson, who engages or professes to engage, in this state, for either all or part of the person's time, directly or indirectly, either in the business of the sale of securities for the person's own account, or in the business of the purchase or sale of securities for the account of others in the reasonable expectation of receiving a commission, fee, or other remuneration as a result of engaging in the purchase and sale of securities."

**{¶20}** R.C. 1701.01(E)(1)(a) states that:

> "'[d]ealer' does not mean * * * [a]ny issuer, including any officer, director, employee, or trustee of, or member or manager of, or partner in, or any general partner of, any issuer, that sells, offers for sale, or does any act in furtherance of the sale of a security that represents an economic interest in that issuer, provided no commission, fee, or other similar remuneration is paid to or received by the issuer for the sale[.]"

We will refer to this as the "issuer exception." "'Issuer' means every person who has issued, proposes to issue, or issues any security." R.C. 1707.01(G). "Person" includes "a natural person, firm, partnership, limited partnership, partnership association, syndicate, joint-stock company, unincorporated association, * * * and a corporation or limited liability company organized under the laws of any state[.]" R.C. 1707.01(D).

**{¶21}** Mr. Willan concedes that the State presented evidence that while an employee of Evergreen Homes, Mohler handled and processed customer inquiries and requests for purchases of Evergreen Investment debt securities, that Evergreen Homes paid him commissions for the sales, that he was not licensed to sell securities, and that Evergreen Investment, Evergreen

Homes, and Mr. Willan were not licensed as dealers. Mr. Willan's argument is that Mohler was not a "salesperson" within the meaning of R.C. 1707.01(F)(1) because Mr. Willan and his Evergreen companies were not "dealers" within the meaning of R.C. 1707.01(E)(1).

{¶22} We turn to examining whether Mr. Willan, Evergreen Investment, and Evergreen Homes were dealers as contemplated by the Ohio Revised Code. It is clear from R.C. 1707.01(E)(1)(a) that, with respect to Evergreen Homes' own securities, it fell within the issuer exception. Thus, it is not surprising that Mr. Willan was not charged with any crimes under R.C. 1707.44(A)(1) concerning the sale of Evergreen Homes' own securities. The remaining question, therefore, becomes whether Evergreen Homes was a dealer of Evergreen Investment's securities through the action of its employee, Mohler. Again, the general definition of dealer, provides that a dealer is:

> "every person, other than a salesperson, who engages or professes to engage, in this state, for either all or part of the person's time, directly or indirectly, either in the business of the sale of securities for the person's own account, or in the business of the purchase or sale of securities for the account of others in the reasonable expectation of receiving a commission, fee, or other remuneration as a result of engaging in the purchase and sale of securities." R.C. 1707.01(E)(1).

{¶23} Neither the phrase "for the person's own account[,]" nor the phrase "for the account of others" has been defined in the relevant chapter of the Ohio Revised Code. When words are not defined in a statute, they shall be given their ordinary meaning and construed according to common usage. See R.C. 1.42. However, even after considering the common meanings of the word "account[,]" it is unclear how the phrases should be interpreted. See Merriam-Webster's Collegiate Dictionary (11 Ed.2005) 8. The phrase "for the person's own account" could be viewed as analogous to the phrase "on one's own account[,]" which is defined as "on one's behalf[.]" Id. Thus, "for the person's own account" could mean on behalf of the person or for the person's benefit, whereas "for the account of others" could mean for the benefit

of others or on behalf of others. R.C. 1707.01(E)(1). Given that these are the broadest definitions of the phrases that we believe are applicable, we will proceed to consider the statute in light of those definitions.

{¶24} The latter half of the definition of dealer, discussing selling securities "for the account of others[,]" requires that the person, here Evergreen Homes, received a commission, fee, or similar remuneration for the sale of the securities. R.C. 1707.01(E)(1). Even assuming that Evergreen Homes was selling securities "for the account of others[,]" because Evergreen Homes did not receive a commission, fee, or similar remuneration for the sale of Evergreen Investment's securities, it was not a dealer as contemplated by the second portion of the statutory definition. R.C. 1707.01(E)(1). Moreover, we note that neither Evergreen Homes nor Mohler *purchased* securities and, thus, could not be said to have received any commission, fee, or similar remuneration "as a result of engaging in the purchase *and* sale of securities." (Emphasis added.) R.C. 1707.01(E)(1).

{¶25} With respect to the first portion of the definition, discussing the sale of securities "for the person's own account," it is unclear to what extent the sale would have to benefit the person to qualify as "for the person's own account" under the statute. R.C. 1707.01(E)(1). For example, if the sale only indirectly benefited the person, it is unclear whether that would be sufficient for the sale to be "for the person's own account[.]" R.C. 1707.01(E)(1). The evidence was undisputed that Evergreen Homes was not receiving any monetary payment whenever Evergreen Investment issued a debt certificate to a customer; moreover, because Evergreen Homes agreed to unconditionally guarantee Evergreen Investment's obligations, every sale of a debt security actually created a significant financial obligation for Evergreen Homes. Nonetheless, it is possible that Evergreen Homes' sale of Evergreen Investment's securities

through Mohler could be seen as indirectly benefiting Evergreen Homes as Evergreen Investment was created to raise capital for Evergreen Homes. However, we believe that, if the legislature had intended such a tenuous benefit to qualify as "for the person's own account," it could have inserted language into the statute that would make such an interpretation more reasonable. R.C. 1707.01(E)(1). As the legislature did not do so, we conclude Evergreen Homes was not selling securities for its own account. Moreover, even if "for the person's own account" could be reasonably interpreted to encompass indirect benefits to that person, under the rule of lenity, any ambiguity in a criminal statute must be construed strictly so as to apply the statute only to conduct that is clearly proscribed. See *United States v. Lanier* (1997), 520 U.S. 259, 266; *State v. Cole* (1994), 94 Ohio App.3d 629, 638, citing R.C. 2901.04. Thus, we conclude that Evergreen Homes was not a dealer, as it was not selling securities for its own account.

{¶26} Next, we turn to examining whether Evergreen Investment was a dealer as contemplated by R.C. 1707.01(E)(1). Even assuming that the activities of Evergreen Investment satisfied the general definition of dealer, by being in the business of selling securities for its own account, R.C. 1707.01(E)(1), we conclude that Evergreen Investment fell within the issuer exception. Evergreen Investment was the issuer of the securities in question because it sold, offered for sale, or furthered the sale of securities which represented an economic interest in Evergreen Investment, and it did not receive any commission, fee, or similar remuneration for the sale. R.C. 1707.01(E)(1)(a). Further, as an officer of the issuer, Evergreen Investment, Mr. Willan also fit within the issuer exception with respect to Evergreen Investment. R.C. 1707.01(E)(1)(a).

{¶27} As Mr. Willan, Evergreen Investment, and Evergreen Homes were not dealers, Mohler was not a salesperson, and Mr. Willan could not be convicted of aiding and abetting him

as an unlicensed salesperson. See R.C. 1707.01(F)(1); R.C. 1707.44(A)(1). Therefore, the State failed to present sufficient evidence that Mr. Willan aided and abetted Mohler as an unlicensed salesperson of securities, as it failed to establish that Mohler was required to be licensed.

{¶28} Through each of the 20 counts at issue, the indictment contained allegations that Mr. Willan and Mohler:

> "did commit the crime of **UNLICENSED DEALER**, in that they did, or did aid and/or abet another, to engage in an act or practice that violates division (A), (B), or (C) of section 1707.14, and/or as a salesperson sold securities in this state without being licensed pursuant to section 1707.16 of the Revised Code, to wit: one or more 'certificates' * * * in violation of Section 1707.44(A)(1) of the Revised Code[.]"

{¶29} Although Mr. Willan requested a jury instruction that would have limited the jury to considering only whether he aided and abetted Mohler as an unlicensed salesperson, the trial court did not give his proposed instruction. Instead, the trial court broadly instructed the jury on the allegations in the indictment that either Mr. Willan or Mohler acted as an unlicensed dealer:

> "The law of Ohio provides no person shall act as a dealer unless the person is licensed as a dealer by the Division of Securities, except when the person is transacting business through or with a licensed dealer or when the person is an issuer selling securities issued by it or by its subsidiary."

{¶30} The trial court also gave the statutory definition of the term "dealer." R.C. 1707.01(E) defines a "dealer" to include "every person, other than a salesperson, who engages * * * in the business of selling securities for the account of others in the reasonable expectation of receiving a commission, fee, or other remuneration[.]" It was not disputed that Mohler was employed by Evergreen Homes and that, in the course of his employment, effectuated the sale of securities with the expectation of being paid commissions. The sole issue here is whether Mohler qualified as one who "engag[ed] * * * in the business of" selling securities within the meaning of R.C. 1707.01(E).

{¶31} R.C. 1707.01 does not define the phrase "engages * * * in the business," nor does it otherwise specify the level of involvement required for one to "engage" in the business of selling securities and, therefore, fall within the definition of a "dealer." The lengthy dictionary definition of "engage" encompasses levels of participation that range from merely "tak[ing] part [in]" to controlling the business by "begin[ning] and carry[ing] on an enterprise, esp. a business or profession." Webster's Third New International Dictionary (1993) 751. Courts construing this phrase in other contexts have resorted to the rules of construction after concluding that the ordinary meaning of "engaging" in a particular business "conceivably covers many classes of employment[,]" encompassing everyone from the proprietor of a business to its low-level employees. *Redding Foods, Inc. v. Berry* (Tex.Civ.App.1962), 361 S.W.2d 467, 469-470 (finding ambiguity in the phrase "engaging in the food business" in the context of contract interpretation). This phrase is used elsewhere in the Ohio Revised Code in contexts that apply to those who own and operate a certain type of business, not all clerical and sales employees involved in the business's operation. See, e.g., R.C. 918.21(A) ("Poultry by-product manufacturer" defined as "any person engaged in the business of manufacturing or processing" certain animal food); R.C. 1315.21(B) ("Check-cashing business" defined as "any person that engages in the business of cashing checks for a fee"); R.C. 3901.32(D) ("Insurer" defined as "any person engaged in the business of insurance"); R.C. 5815.41(A) ("Art dealer" defined as "a person engaged in the business of selling works of art").

{¶32} In *Van Meter v. Pub. Util. Comm.* (1956), 165 Ohio St. 391, the Ohio Supreme Court construed this phrase within the context of R.C. 4923.04, which prohibited operating as a "private motor carrier" on the state's highways without a permit. R.C. 4923.02(A) defined "private motor carrier" to include, in relevant part, a "person * * * engaged in the business of

private carriage of persons or property[.]" The question before the Court was whether Van Meter, as an employee of a trucking company, was "engaged in the business" by driving a truck for his employer. *Van Meter*, 165 Ohio St. at 396. The Court began its analysis by recognizing that "[i]n a broad sense, a servant, while engaged in the business of his master, may be said to be engaged in business." Id. Nonetheless, the Court proceeded to explain why the statutory phrase "engaged in the business" should not be interpreted so broadly, but should be limited to those who direct the operation of the employee's work. "If anyone is engaged in such business, it is the master who is in control of the mode and manner of operating the truck." Id. at 397. Because Van Meter was not an independent contractor, but was strictly an employee under the direction and control of his employer, the Court held that he was not one "engaged in the business" of private motor carriage. Id. at paragraph two of the syllabus.

{¶33} Moreover, the meaning of R.C. 1707.01(E)(1) must be construed within the context of the statutory framework in which it was enacted. See R.C. 1.49; *State v. Moaning* (1996), 76 Ohio St.3d 126, 128. Sheldon Safko, formerly an attorney with the Division of Securities, described dealers as agents who are in the business of selling securities for issuers other than themselves, such as Charles Schwab and Merrill Lynch. He further explained that a dealer is one who can employ a salesperson. See R.C. 1707.01(F). In addition, he testified that, although an individual technically could qualify as a dealer, it was not the practice of the Division to license individuals as dealers and he did not think it was ever done; individuals were licensed as salespeople.

{¶34} Mohler, as an employee of Evergreen Homes, had no ability to employ salespeople, as he worked at the will and direction of Evergreen Homes. R.C. 1707.15, which governs the application and examination required for a dealer's license, further requires that the

dealer have a "principal, officer, director, general partner, manager, or employee" who will take and pass an examination before the state will issue a dealer's license. R.C. 1707.15(C). Mohler, who was strictly an employee of Evergreen Homes, had no "principal, officer, director, general partner, manager, or employee" who could have taken the dealer's licensing exam, so it was not even possible for him to comply with the statutory requirement of becoming licensed as a dealer.

{¶35} Consequently, the language of R.C. 1707.01(E) can reasonably be construed to apply only to a person or entity that directs and controls the manner and means of the securities sales activity. The language of the definition is subject to conflicting interpretations, one of which does not apply to Mohler. See *State ex rel. Toledo Edison Co. v. Clyde* (1996), 76 Ohio St.3d 508, 513. Under the rule of lenity, any ambiguity in a criminal statute must be construed strictly so as to apply the statute only to conduct that is clearly proscribed. See *Lanier*, 520 U.S. at 266; *Cole*, 94 Ohio App.3d at 638, citing R.C. 2901.04. Because it is not clear that R.C. 1707.01(E)(1)(a) was intended to define "dealer" to include an employee who performs merely clerical functions and works at the direction and control of his employer, this Court cannot construe it to apply to Mohler's securities sales activities.

{¶36} Because the State failed to prove that Mohler, Mr. Willan, Evergreen Homes, or Evergreen Investment qualified as salespeople or dealers within the meaning of R.C. 1707.01(E) and (F), none of them was required to be licensed to sell the Evergreen Investment debt securities. Therefore, the State failed to present sufficient evidence to support Mr. Willan's 20 convictions under R.C. 1707.44(A)(1).

Second Mortgages

{¶37} Mr. Willan was convicted of 22 counts of being a second mortgage lender without first obtaining the requisite certificate of registration from the Division of Financial Institutions

of the Ohio Department of Commerce. The State established that Evergreen Homes had retained second mortgages on 22 properties that it sold and that it had never obtained a certificate of registration to conduct business as a second mortgage lender.

{¶38} Again, Mr. Willan does not challenge the State's proof of those facts but raises a legal argument that his business activity did not require Evergreen Homes to register as a second mortgage lender under R.C. 1321.52. At the time Mr. Willan committed the alleged offenses, from February 21, 2003 through February 26, 2006, R.C. 1321.52(A)(1)(b) provided that "[n]o person * * * shall * * * without having first obtained a certificate of registration from the division of financial institutions * * * [e]ngage in the business of lending or collecting the person's own * * * money, credit, or choses in action for such loans[.]" R.C. 1321.52(A)(1)(a) explained that "such loans" are those "secured by a mortgage on a borrower's real estate which is other than a first lien on the real estate[.]"

{¶39} Evergreen Homes did not lend money to any of the homebuyers. The second mortgages at issue arose from an interest Evergreen Homes retained in the homes it sold. Evergreen Homes sold each of these properties using a similar financing arrangement: the homebuyer agreed to pay Evergreen Homes approximately 80 percent of the purchase price by borrowing money from a lending institution; the lender held a first mortgage on the property; and each homebuyer paid the remaining 20 percent balance to Evergreen Homes over time. The arrangement between Evergreen Homes and the homebuyer was something akin to a modified land contract, although Evergreen Homes did not retain title to the property. Instead, to protect its right to receive the 20 percent balance of the purchase price, Evergreen Homes held a second mortgage on each property and allowed the homebuyer to pay the remainder of the purchase price in installments.

{¶40} Mr. Willan maintains that this type of second mortgage arrangement did not fall within R.C. 1321.52(A)(1)(b) because Evergreen Homes was not conducting any business connected with "*loans*" secured by a second mortgage on real estate. The critical missing link for these convictions is that Evergreen Homes did not lend money to any of the homebuyers in exchange for its second mortgage. It merely retained an interest in the property to secure its right to payment of the 20 percent balance of the purchase price. Again, Mr. Willan has raised a persuasive legal argument that his business activity did not fall within the relevant statutory language.

{¶41} Although R.C. Chapter 1321 does not directly define the term "loan," it explicitly recognized then and now that a "loan" involves the advancement of cash by the lender to, or on behalf of, the borrower. R.C. 1321.51(F) has long defined an "interest bearing loan" as one that is expressed as the "principal amount" plus interest computed on the unpaid principal balance. "Principal amount" is defined as "the amount of cash paid to, or paid or payable for the account of the borrower[.]" R.C. 1321.51(D).

{¶42} The New York Court of Appeals has held that this type of real estate transaction, in which a seller retains a mortgage on the property to secure his right to an unpaid balance of the purchase price, is not a "loan" because no money was advanced by the seller. See *10 East Realty, LLC v. Incorporated Village of Valley Stream* (2009), 12 N.Y.3d 212, 215; *Mandelino v. Fribourg* (1968), 23 N.Y.2d 145. "The fact that the consideration in this sale mentions an interest rate and a term of payment, or that a mortgage was taken as a security interest, does not make this transaction involving a deferred payment plan" a loan within the meaning of the state constitution. *10 East Realty*, at 215.

{¶43} The Ohio Revised Code likewise distinguishes a "loan" from a deferred payment plan within the context of retail consumer sales. A "retail installment sale" is a sale in which the retail seller transfers goods to the buyer and the "cash price may be paid in installments over a period of time." R.C. 1317.01(A). A "purchase money loan," on the other hand, involves "a cash advance that is received by a consumer from a creditor" that is applied to the consumer transaction. R.C. 1317.01(Q).

{¶44} This Court was unable to find any authority to support the State's position that a "loan" under R.C. 1321.52 can encompass Evergreen Homes' business practice of transferring homes to buyers before it had received full payment and allowing the buyers to pay the balance over time. As emphasized already, the statute must be strictly construed to apply "only to conduct that is clearly covered." See *United States v. Lanier*, 520 U.S. at 266. Because Evergreen Homes did not advance any money to its homebuyers, it did not issue "loans" in connection with the second mortgages, and it did not fall within R.C. 1321.52(A)(1)(b) as a second mortgage lender. Consequently, the State failed to present sufficient evidence to support Mr. Willan's 22 convictions of violating R.C. 1321.52(A)(1)(b).

Small Loans

{¶45} Mr. Willan was convicted of 17 counts of violating the Small Loans Act. Specifically, he was convicted under R.C. 1321.02, which provides now, as it did then, that "[n]o person shall engage in the business of lending money, credit, or choses in action in amounts of five thousand dollars or less * * * without first having obtained a license from the division of financial institutions[.]"

{¶46} The State's evidence that Mr. Willan issued small loans consisted solely of documentation that was seized in the search of his offices. The documents included promissory

notes payable to Evergreen Investment, as well as worksheets, other office documentation, and e-mail communications about some of the loans, which indicate that Evergreen Investment made several loans, in amounts of $5,000 or less, at rates of interest of 12 and 18 percent. The State also presented evidence that the Division of Financial Institutions had never issued a license to Mr. Willan or Evergreen Investment to issue small loans.

{¶47} The State offered no testimony from any of the alleged borrowers, however, nor did Mr. Willan or anyone who worked for him testify about the alleged loans. The State sought to establish Mr. Willan's criminal liability based on the fact that he made loans without a license. It presented no evidence that he acted with any degree of culpability in violating the Small Loans Act, but instead proceeded on a theory that R.C. 1321.02 imposed strict liability on anyone who engaged in the business of issuing small loans without a license, regardless of their awareness of a need to be licensed.

{¶48} This Court found no legal authority to support the State's theory that R.C. 1321.02 imposes strict liability for issuing small loans without a license. Although Mr. Willan has focused upon the State's failure to specify the applicable interest rate as to the alleged loans, "[o]ne of the elements to be determined in a sufficiency of the evidence analysis is the mental state of the defendant in committing the [crime.]" *State v. Fusillo*, 11th Dist. No. 2004-T-0005, 2005-Ohio-6289, at ¶27.

{¶49} R.C. 1321.02 fails to specify any culpable mental state. R.C. 2901.21(B) provides that, "[w]hen the section defining an offense * * * neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense." There is no language in R.C. 1321.02 to plainly indicate a legislative purpose to impose strict liability.

{¶50} The Ohio Supreme Court has addressed the application of R.C. 2901.21(B) many times in recent years. See, e.g., *State v. Johnson*, 128 Ohio St.3d 107, 2010-Ohio-6301; *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830; *State v. Lester*, 123 Ohio St.3d 396, 2009-Ohio-4225; *State v. Clay*, 120 Ohio St.3d 528, 2008-Ohio-6325; *State v. Lozier*, 101 Ohio St.3d 161, 2004-Ohio-732. As the Ohio Supreme Court emphasized in *Horner*, it has found legislative intent to impose strict liability where the legislature chose to include a level of culpability in one discrete clause, subsection, or division, but not in another part of that same statute. Id. at ¶54. It further stressed in *Johnson* that R.C. 2901.21(B) "is concerned with the offense as a whole" and applies only if the definition of the offense fails to include a mens rea element. 2010-Ohio-6301, at ¶37.

{¶51} Mr. Willan was convicted under R.C. 1321.02, a statute that includes no subsections, specifies no level of culpability for any element of the offense, and does not incorporate another offense that does. See *State v. Wharf* (1999), 86 Ohio St.3d 375, 377 (explaining that, although the definition of robbery under R.C. 2911.02(A)(1) includes no specific mens rea, it incorporates the mental state of a theft offense). In construing the language of a statute that specifies no level of culpability for any element of the offense, the Ohio Supreme Court has refused to infer a legislative intent to impose strict liability absent actual language to that effect in the statute. See, e.g., *State v. Collins* (2000), 89 Ohio St.3d 524, 530. Despite persuasive public policy arguments, the Court refused to write language into the statute that "simply is not there-language which the General Assembly could easily have included, but did not." Id. at 529-530.

{¶52} The Supreme Court has also emphasized that "[t]he fact that the statute contains the phrase 'No person shall' does not mean that it is a strict criminal liability offense." *State v.*

*Moody*, 104 Ohio St.3d 244, 2004-Ohio-6395, at ¶16. Instead, it stressed that "[t]here must be other language in the statute to evidence the General Assembly's intent to impose strict criminal liability." Id. There is no language in R.C. 1321.02 to suggest any legislative intent to impose strict liability. See *State v. Annable*, 194 Ohio App.3d 336, 2011-Ohio-2029, at ¶33-35 (refusing to construe similar language in R.C. 4731.41 as imposing strict liability for practicing medicine without a license).

{¶53} Lending money and charging interest is legal activity that is criminalized by R.C. 1321.02 if one lends repeatedly and does not obtain the requisite license. To construe this statute as imposing strict liability would also raise due process concerns because it criminalizes a failure to act, when the offender would not necessarily have any notice of his obligation to obtain a license. Although some statutes that criminalize an offender's failure to act have been construed to impose strict liability, those statutes typically involve situations in which the offender would have had prior notice of his obligation to take action, such as through a prior court order or the rules pertaining to a license that he has already obtained. See, e.g., *State v. Hardy*, 9th Dist. No. 21015, 2002-Ohio-6457 (holding that R.C. 2950.06 imposes strict liability for a sexually oriented offender's failure to verify his current address); *State v. Shaffer* (1996), 114 Ohio App.3d 97 (strict liability standard imposed for operating a licensed cemetery without an endowment care fund). See, also, *Collins*, 89 Ohio St.3d at 531-533 (Lundberg Stratton, J., concurring in part and dissenting in part) (disagreeing with majority that R.C. 2919.21(B), which criminalizes a failure to pay court-ordered support, was not a strict liability offense).

{¶54} Moreover, the potential criminal sanctions for violating R.C. 1321.02 provide further support for our conclusion that it should not be construed as creating a strict liability offense. Strict liability is not generally appropriate when an offense is punishable by

imprisonment. *U.S. v. U.S. Gypsum Co.* (1978), 438 U.S. 422, 443, fn.18, citing Sayre, Public Welfare Offenses (1933), 33 Colum.L.Rev. 55, 72; see, also, *State v. Brewer* (1994), 96 Ohio App.3d 413, 416. A violation of R.C. 1321.02 constitutes a fifth degree felony, which is punishable by a prison term of six to twelve months. R.C. 1321.99(A); R.C. 2929.14(A)(5).

{¶55} For all of these reasons, this Court concludes that, in addition to the elements explicitly set forth in the statute, R.C. 1321.02 requires proof that the offender acted recklessly with regard to whether he needed a small loan license. Because the State failed to present any evidence that Mr. Willan had any awareness of a need to have a small loan license or that he otherwise acted recklessly as to his need to obtain a license to issue small loans, there was insufficient evidence to support his convictions of issuing small loans without a license under R.C. 1321.02.

{¶56} The State failed to present sufficient evidence that Mr. Willan violated R.C. 1707.44(A)(1), 1321.52(A)(1)(b), or 1321.02 through his securities sales, second mortgage, or small loan business practices.

**Misrepresentation Offenses**

{¶57} Mr. Willan's misrepresentation convictions were based on his statements in the securities filings of Evergreen Homes and the offering circular of Evergreen Investment that no commissions would be paid in connection with the sale of the securities. These offenses focus on misrepresentations that were made on securities forms filed with the state and in the offering circular for the Evergreen Investment debt securities. Mr. Willan concedes that the representations were false because Mohler was paid a commission for most of the securities sales. His challenges to the sufficiency of evidence focus primarily on whether these

misrepresentations were material and/or whether he made them with knowledge that they were false or with a purpose to defraud anyone.

Registering Securities

**{¶58}** Mr. Willan was convicted of five counts of making a material false representation for the purpose of registering or exempting securities from registration when he registered two separate offerings of Evergreen Investment's debt securities and when he filed for an exemption from registration of three separate offerings of equity securities. Mr. Willan was alleged to have committed these offenses during 2004 and 2005. At that time, R.C. 1707.44(B)(1) provided that "[n]o person shall knowingly make * * * any false representation concerning a material and relevant fact * * * in any * * * circular, description, application, or written statement, for any of the following purposes: [r]egistering securities * * * or exempting securities * * * from registration, under this chapter[.]"

**{¶59}** Although all of these convictions involved Mr. Willan's misrepresentations about the payment of commissions in connection with the securities sales, because he filed entirely different forms with the state for the two types of securities, this Court will address them separately. Counts two and five of the indictment focused on Mr. Willan's registration of two offerings of debt securities issued by Evergreen Investment. On February 18, 2004, Evergreen Investment filed forms with the Division of Securities of the Ohio Department of Commerce to register a $5 million offering of debt securities. The securities consisted of certificates that would be sold at face value in multiples of $500, earn interest at a set rate, and would mature at the end of six months, one year, or two years.

**{¶60}** The registration paperwork filed by Evergreen Investment included the required Form 6(A)(1), as well as the offering circular that Evergreen Investment would use to inform

investors about the Evergreen companies and each security offering. On June 10, 2005, Evergreen Investment filed similar paperwork to register a $10 million offering of debt securities. Each offering circular stated that "[n]o commissions * * * will be paid * * * in connection with the sale of the Certificates." The Form 6(A)(1) filed to register the securities did not include any misrepresentation about commissions. The only misrepresentation was in the offering circular that was filed along with the Form 6(A)(1).

{¶61} Although Mr. Willan concedes that the statement in the circular regarding commissions was false, and that the circular was filed along with his registration paperwork, he maintains that the State failed to prove that the false statements in the circular were made for the purpose of registering securities or that they were material to the registration process. He argues that the State's evidence demonstrated that the purpose of the statements in the circular was to sell the securities, yet he was convicted of making false statements for the purpose of *registering* the securities, not the offense of making a false representation for the purpose of *selling* securities under R.C. 1707.44(B)(4).

{¶62} Although many federal cases involve material misrepresentations in the registration of securities, those cases provide little guidance because they involve civil suits brought by investors and, necessarily, focus on whether the misrepresentation was material to investors' decisions to invest. See, e.g., *TSC Industries, Inc. v. Northway* (1976), 426 U.S. 438. The focus here was not whether investors' decisions would have been affected by Mr. Willan's misstatement about the commissions but whether the Division of Securities was materially misled in its decision to register the securities. The transaction at hand was registration, so the focus of this offense was on whether Mr. Willan's misrepresentation likely would have

influenced the decision of the Division of Securities to process the registration of Evergreen Investment's securities.

{¶63} The State presented the testimony of Sheldon Safko, formerly an attorney with the Division of Securities, who testified that the Division reviews the offering circular as part of the registration process to make sure that investors will have the information they need to make a competent decision about whether to invest. He further explained that the offering circular is "like a road map for the investor." The circular should include information about the company and the investment product so an investor can make an informed decision whether to invest in the company. Safko did not testify, however, that this information would have affected the registration of Evergreen Investment's securities in any way. He gave no explanation of how the information about commissions, or any other information in the circular, has any bearing on the Division's decision to approve or process the registration of a securities offering. Although the State established that the information in the circular was relevant to the sale of securities, it offered no evidence that Mr. Willan made this misstatement for the purpose of registering the securities or that it was material or relevant to the registration of the security offering. Therefore, as to Mr. Willan's convictions under counts two and five of the indictment, the State presented insufficient evidence that he knowingly made material and relevant false statements for the purpose of registering the debt security offerings.

{¶64} Mr. Willan's remaining convictions of false representation in the registration of securities, as stated in counts three, four, and six of the indictment, focused on entirely different forms that Mr. Willan filed on behalf of Evergreen Homes to exempt its equity securities from state registration. On November 24, 2004, April 29, 2005, and July 25, 2005, Mr. Willan filed the requisite "Form D" with the Division of Securities to exempt a total of $4 million in equity

securities offerings from state registration requirements. Again at issue is Mr. Willan's misrepresentation that no commissions would be paid in connection with the sale of these securities.

{¶65} The State introduced the Form Ds that are at issue in these counts to prove that Mr. Willan made misrepresentations on the Form D that was required to be filed to exempt the securities from registration. It argued that Mr. Willan falsely represented that no commissions would be paid in connection with the sales of the securities and that Mr. Willan failed to list the payment of commissions as an expense. At trial, the State focused its argument on Mr. Willan's failure to include the payment of commissions in the listing of expenses on each Form D. In particular, Section C, Item 4 of each Form D filed by Evergreen Homes included a line to list the amount of "Sales Commissions" that would be paid in connection with the offering. Each Form D filed by Evergreen Homes left the commission expense line blank and, consequently, no commissions were deducted from the gross amount of the offering to arrive at the "adjusted gross proceeds to the issuer." Mr. Willan maintained then and now that his failure to include the commissions as an expense did not constitute an affirmative misrepresentation and, therefore, could not constitute a violation of R.C. 1701.44(B)(1). However, this argument ignores the fact that Mr. Willan also made an affirmative representation that no commissions would be paid in connection with the sales of the securities.

{¶66} Although not emphasized by the State at trial, in addition to Mr. Willan's failure to include commissions as an expense to be deducted from the issuer's proceeds, each Form D included an affirmative misrepresentation that no commissions would be paid. Section B, Item 4 of each Form D required the issuer to include information about "each person who has been or will be paid or given, directly or indirectly, any commission or similar remuneration for

solicitation of purchasers in connection with sales of securities in the offering." Section B, Item 4 included blank lines for the name, address, and other information about each person who would receive commissions. Each Form D filed by Evergreen Homes included the response "None." to Section B, Item 4 and no other information.

{¶67} The State also established that the misrepresentation about the payment of commissions was relevant and material to the State's review of whether these securities qualified for an exemption from state registration. Form D provides almost an entire page for information about the people who have been or will be paid commissions in connection with the sale of securities in the offering, including the name of their associated broker or dealer. The State presented the testimony of Sheldon Safko, who explained that information about who would receive commissions was relevant and material to the Division's review of each Form D because the securities offering would not qualify for a Rule 506 registration exemption if the securities sales involved the payment of commissions to people who were not licensed with the state to sell securities.

{¶68} At the time Mr. Willan filed each Form D to qualify for the registration exemption, R.C. 1707.03(X) provided that an "offer or sale of securities made in reliance on the exemption provided in Rule 506 of Regulation D under the Securities Act of 1933 * * * is exempt provided that all of the following apply:

"(1) The issuer makes a notice filing with the division on form D of the securities and exchange commission within fifteen days of the first sale in this state;

"(2) Any commission, discount, or other remuneration for sales of securities in this state is paid or given only to dealers or salespersons licensed under this chapter;

"(3) The issuer pays a filing fee of one hundred dollars to the division; however, no filing fee shall be required to file amendments to the form D of the securities and exchange commission."

{¶69} By misrepresenting that no commissions would be paid, when in fact Mr. Willan knew that commissions would be paid to someone who was not a dealer or salesperson licensed in this state, Mr. Willan made material false statements on each Form D he filed. Had the commission payments to Mohler been disclosed, Evergreen Homes would have been required to fully register each of the three equity securities offerings with the state or commit another offense by selling unregistered securities. A reasonable inference from this evidence is that Mr. Willan's purpose in making the misrepresentation about the commissions was to qualify his securities offering for the registration exemption.

{¶70} Despite Mr. Willan's argument to the contrary, the State presented sufficient evidence that he made these misrepresentations with knowledge that they were false. Although Mr. Willan's former counsel completed each Form D, he sent the forms to Mr. Willan for him to review and sign. Each Form D was only a few pages long and included little information for Mr. Willan to review. The statement about the commissions would have been noticeable from even a brief review of the forms. Moreover, Mr. Willan signed each Form D directly below a series of statements, representing that he was familiar with the conditions that must be satisfied for the exemption, that he understood that the issuer had the burden of demonstrating that it qualified for the exemption, and that he had "read this notification and knows the contents to be true[.]"

{¶71} Although it is not clear exactly when Mr. Willan began paying Mohler commissions to sell the debt securities, the first Form D to exempt the equity securities from registration was not filed until November 24, 2004. The State presented evidence that, although Mohler initially worked for Evergreen selling homes, he had shifted to securities sales by the end of 2003. Mohler had been selling securities for Evergreen throughout 2004 and, by the end of that year, had earned over $190,000 in commissions. Mohler testified that he first sold debt

securities for Evergreen Investment and then Mr. Willan asked him to sell the equity securities for Evergreen Homes when those sales began. Mohler further explained that Mr. Willan paid him a four-percent commission to sell the equity securities, which was a significant increase from the one-percent commission that he had been receiving for selling the debt securities. This evidence supported a reasonable inference that Mr. Willan knew that Mohler would be selling the equity securities and receiving a commission at the time he represented otherwise to the Division of Securities on each Form D. Therefore, the State presented sufficient evidence to support Mr. Willan's convictions of false representation in the registration of securities, as charged in counts three, four, and six of the indictment.

Theft Offenses

{¶72} Mr. Willan was convicted of aggravated theft and theft from the elderly under R.C. 2913.02(A)(3) for sales of his securities between January 1, 2003, and June 19, 2006. Throughout that period, R.C. 2913.02(A)(3) provided that "[n]o person, with purpose to deprive the owner of property * * * shall knowingly obtain or exert control over * * * the property * * * [b]y deception[.]" Mr. Willan challenges the sufficiency of evidence supporting his theft convictions on several grounds, including that the State failed to prove that he obtained control over any investor's money by deception or that he acted with a purpose to deprive investors of their money.

{¶73} "Deception" has long been defined in R.C. 2913.01(A) as:

"knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."

{¶74} The State presented the testimony of many alleged theft victims, who testified that they had invested amounts ranging from $20,000 to several hundred thousand dollars in securities in one or both of Mr. Willan's two companies and that they never received a refund of their investment. Several of the witnesses testified that they were over 65 years old. The State offered no evidence, however, that Mr. Willan, Mohler, or anyone else associated with Mr. Willan had deceived any of the alleged victims about how their money would be invested.

{¶75} Most of the State's witnesses testified about investing in the debt securities sold by Evergreen Investment. They learned about the investment opportunity primarily from newspaper advertisements and had been drawn to the debt securities because they paid a very high rate of return, in excess of ten percent annually. One witness explained that it was "absolutely" a higher rate of return than many of her other investments. Almost every witness testified that they understood at the time they invested that a high rate of return was associated with a higher risk investment. Each had received a copy of the offering circular, which fully explained that this investment carried many risks. The circular explained that the investment was not federally insured but was directly tied to the success of the Evergreen Companies, which depended on the strength of the housing and mortgage lending markets, both of which were subject to economic fluctuations. As several witnesses explained, however, the housing market was strong at the time they invested and Evergreen Homes was a growing company, so they thought that this was a safe investment.

{¶76} The deception alleged by the State again focused on Mr. Willan's false representation in the offering circular that no commissions would be paid in connection with the sale of securities. There was no evidence, however, that any of these investors gave money to Mr. Willan's companies due to his false statement about commissions. One by one, the investors

testified that they had invested with Evergreen Investment or Evergreen Homes due to the high rate of return that the companies were paying on the investments. Most witnesses explained that they never considered how Mohler was paid or whether he was receiving commissions. The State did present one witness who testified that he had asked Mohler whether he was receiving a commission, because he had a bad experience several years earlier with a commissioned salesperson, and that Mohler told him that he was paid a salary. That witness did not further testify, however, that he had invested with Evergreen Investment due to Mohler's statement that he did not receive commissions.

{¶77} Moreover, even if one investor might have been deceived by the misinformation about the payment of commissions, the State failed to present any evidence that Mr. Willan acted with a purpose of depriving the investors of their money. Mr. Willan's position throughout these proceedings was that he was conducting a legitimate housing business and sought investors to provide capital to purchase more properties to improve. He maintained that his failure to return the investors' money was due to the eventual insolvency of his businesses. Despite the State's attempts to depict Mr. Willan's investment plan as a "Ponzi" scheme, it never presented any evidence to support that characterization. A so-called "Ponzi scheme" was named after Charles Ponzi, who defrauded investors of millions of dollars by convincing them that their money was earning a high rate of return when, in fact, he had not invested their money in anything. See *Cunningham v. Brown* (1924), 265 U.S. 1, 7-8. His scheme was a total sham because he "made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes." Id. at 8. Nothing in the record before us supports the State's allegations that Mr. Willan's investment plan was a sham. Investors were told that their money would be

used to provide capital to allow Evergreen Homes to buy more homes to renovate. The State failed to present any evidence that the investors' money was not used for that purpose.

{¶78} There was evidence that a reputable accounting firm had prepared the income tax filings and financial statements for the Evergreen companies and that the companies were financially solvent through the end of 2005. At some point, both companies filed for bankruptcy protection, but the record fails to disclose when that happened or why. The State failed to present evidence to support even an inference that the eventual insolvency of the Evergreen companies, and the investors' resulting loss of the money they invested, was due to anything other than a downturn in the housing and mortgage markets and the bad publicity that surrounded the sheriff's department raid of their offices.

{¶79} Because the State failed to present evidence that Mr. Willan knowingly exerted control over investors' money by deception with a purpose of depriving them of their money, it failed to present sufficient evidence that Mr. Willan committed the offenses of aggravated theft or theft from the elderly.

Securities Fraud

{¶80} Mr. Willan was convicted of securities fraud under R.C. 1707.44(G) for acts he committed from January 1, 2003 through June 19, 2006. At that time, R.C. 1707.44(G) provided that "[n]o person in * * * selling securities shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited." R.C. 1707.01(J) defined "fraudulent acts" to include "any * * * scheme * * * to obtain money or property by means of any false * * * representation[.]"

{¶81} This conviction was based on allegations similar to those underlying the theft convictions, that Mr. Willan defrauded investors by telling them that no commissions would be

paid in connection with the sale of the securities. As explained already, the State failed to prove that anyone invested with his companies due to fraudulent misrepresentations or that the investment plan for his businesses involved anything other than a legitimate investment strategy. Again, Mr. Willan has demonstrated that the State failed to present sufficient evidence to support this conviction.

### Engaging in a Pattern of Corrupt Activity

**{¶82}** Mr. Willan was convicted of engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1) for acts that he committed between January 2002 and July 2006. During that period, R.C. 2923.32(A)(1) provided that "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."

**{¶83}** Mr. Willan's challenge to this conviction is premised on his challenges to each of the predicate offenses at the first trial, which included false representation in the registration of securities, securities fraud, and the theft offenses. Although we have concluded that there was insufficient evidence to support some of these convictions, there was sufficient evidence to support his convictions under R.C. 1707.44(B)(1) of three counts of making a false representation in the Form D filings of three separate offerings of equity securities. R.C. 2923.31(I)(2)(a) explicitly defined "corrupt activity" to include a violation of "division (B), (C)(4), (D), (E), or (F) of section 1707.44 * * * of the Revised Code."

**{¶84}** A conviction under R.C. 2923.32 required proof that Mr. Willan acted through an "enterprise" and engaged in a "pattern" of corrupt activity. R.C. 2923.31(C) defines an enterprise to include "any individual, * * * corporation * * * or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity."

R.C. 2923.31(E) defines a "[p]attern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

{¶85} The State presented evidence that Mr. Willan, acting through his company Evergreen Homes, made false representations to the Division of Securities so he could exempt Evergreen Homes' equity securities from state securities registration. In connection with three separate offerings of equity securities, in November 2004, April 2005, and July 2005, Mr. Willan misrepresented to the Division of Securities that his securities were exempt from registration requirements because no commissions would be paid in connection with their sale. Each act was directly related to providing funds for the affairs of his Evergreen companies and the acts were not isolated or so closely connected in time that they could be construed to constitute a single event. The pattern of corrupt activity involved a total of $4 million in securities that Mr. Willan was able to exempt from state registration as a result of the false representation. Therefore, the State presented sufficient evidence to support Mr. Willan's conviction of engaging in a pattern of corrupt activity.

**Mr. Willan's Second Trial**

{¶86} Following his second jury trial, Mr. Willan was convicted of falsification under R.C. 2921.13(A)(5) and tampering with records under R.C. 2913.43(A)(1). These convictions stemmed from statements Mr. Willan made on two state applications that he had never been convicted of a criminal offense when, in fact, he had a 1992 misdemeanor conviction for passing a bad check. Although it was not legally necessary for him to have done so, Mr. Willan filed applications with the Division of Financial Institutions of the Ohio Department of Commerce, on

behalf of Evergreen Homes and Evergreen Investment, to register the companies as second mortgage lenders. Each application was received by the Division of Financial Institutions on June 9, 2005 and the misrepresentation made by Mr. Willan was the same on each application.

{¶87} Item number 15 of the application asks whether the applicant or any "partners, members, corporate officers, or directors * * * [has] ever been arrested for, charged with or convicted of any violation of any federal, state or local civil or criminal statute[.]" The question explicitly excludes minor traffic violations, but includes no other exclusions or limitations. After item 15 of each form filed by Mr. Willan, the "No" response box was checked. Item 11 of the Schedule 17 attached to each application further asked, "Have you * * * ever pleaded guilty * * * or been found guilty by a judge or jury of any violation of any law of Ohio or elsewhere (excluding motor vehicle traffic laws)?" The response "no" was typed on the line below the question. Schedule 17 was signed and sworn by Mr. Willan and notarized by his former counsel.

{¶88} Each application also included the following attestation that was signed by Mr. Willan:

> "I (We) swear that this application and any attachments have been * * * carefully reviewed by me (us) and constitute a complete, truthful, and correct statement of all information required herein. I realize that any false or fraudulent representation * * * will be grounds for a denial of this application * * * and is subject to criminal prosecution under Section 2921.13 of the Ohio Revised Code."

{¶89} Although the false statements by Mr. Willan led to his convictions of both tampering with records and falsification, he has not challenged the falsification conviction on appeal, nor did he challenge it with a Crim.R. 29 motion at trial. He essentially conceded that the State had presented sufficient evidence to support the falsification conviction, because he made a false statement about his prior conviction on a state application and the State had presented sufficient evidence that he had done so knowingly. See R.C. 2921.13(A)(5)

{¶90} Mr. Willan challenges the sufficiency of the evidence supporting his conviction of tampering with records under R.C. 2913.42(A)(1), which provided at the time of the alleged offense that "[n]o person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall * * * [f]alsify * * * any * * * record[.]" "Defraud" meant to "knowingly obtain, by deception, some benefit for oneself or another[.]" R.C. 2913.01(B).

{¶91} Mr. Willan argues that the State failed to present sufficient evidence that he falsified the second mortgage application with purpose to defraud the Division of Financial Institutions. Proof of a defendant's purpose or intent is typically established through circumstantial evidence, as direct evidence will seldom be available. *State v. Lott* (1990), 51 Ohio St.3d 160, 168.

{¶92} At trial, the parties attached significance to the fact that Mr. Willan obtained a criminal background check, but the results were never received by the Division of Financial Institutions. The background check was also part of the application process to register as a second mortgage lender. The defense attempted to establish that Mr. Willan properly completed the background check and directed that the results be forwarded to the Division, but that the Division apparently never received the results. It was unclear from this evidence whether Mr. Willan had properly directed that the background information be forwarded to the State. Moreover, the fact that he may have completed that component of the second mortgage application process did not change the fact that he made false statements on the application.

{¶93} There was sufficient evidence before the jury to support a reasonable inference that Mr. Willan knowingly gave false information about his prior conviction with a purpose of getting his second mortgage registration approved. The sole purpose of the application was to

obtain a certificate of registration as a second mortgage lender in Ohio. In response to two separate questions, Mr. Willan gave false information about his criminal background. He signed an attestation that he swore that he had carefully reviewed the application and attachments, that all information was complete and truthful, and that he realized that any false statements could subject him to criminal prosecution and/or a denial of his application. A reasonable juror could infer from this evidence that Mr. Willan knowingly lied about his prior conviction, with the intention that the Division would not discover the truth and allow him to register with the state as a second mortgage lender.

### Sufficiency Summary

**{¶94}** In summary, the State failed to present sufficient evidence to support Mr. Willan's convictions in the first trial of unlicensed dealer, unregistered second mortgage lender, violating the Small Loans Act, the two counts of false representation in the registration of securities that pertained to the debt securities, securities fraud, aggravated theft, and theft from the elderly. His first assignment of error is sustained to the extent it challenges those convictions. The State did present sufficient evidence to support Mr. Willan's convictions in the first trial of false representation in the registration of securities as charged in counts three, four, and six of the indictment and engaging in a pattern of corrupt activity. It also presented sufficient evidence to support his convictions in the second trial of tampering with records and falsification. Mr. Willan's assignment of error as it pertains to those convictions is overruled.

### VALIDITY OF SEARCH WARRANT

**{¶95}** Mr. Willan's third assignment of error is that the trial court erred in denying his motion to suppress all evidence seized in the June 6, 2006, raid of his companies' offices because the warrant to search each location was based on an affidavit that contained false information.

Mr. Willan points to a few isolated statements made by the affiant that were later proven to be false or exaggerated, at either the suppression hearing or at trial, both of which occurred more than two years after the State was able to verify the information that was the target of the search. "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either 'intentionally, or with reckless disregard for the truth.'" *State v. Waddy* (1992), 63 Ohio St.3d 424, 441, quoting *Franks v. Delaware* (1978), 438 U.S. 154, 155-156. Moreover, even if the affidavit included such false statements, the warrant remains valid unless "'the affidavit's remaining content is insufficient to establish probable cause[.]'" Id.

{¶96} Mr. Willan has failed to demonstrate that the affiant intentionally made any false statements or that he made them with a reckless disregard for their truth. Moreover, he has failed to demonstrate that the isolated statements at issue were material to the overall validity of the warrant in any way. Mr. Willan pointed to a few statements that exaggerated the amount of money he had drawn from his companies and stated that the Division of Securities had initiated the criminal investigation when, in fact, it was the sheriff's department. Although Mr. Willan also maintains that the affiant made a false statement that Evergreen Investment was insolvent as of May 2006, there is nothing in the record to establish whether that statement was true or false. Overall, the affidavit includes true statements about the nature of Mr. Willan's businesses and his relationship to them, that he was drawing more than his allotted annual salary to the potential detriment of his investors, the interrelationship of the Evergreen companies and that Mr. Willan moved money between the two companies, that Mohler was selling securities and receiving commissions but was not licensed to sell securities, and that Mr. Willan had made misrepresentations to the state and investors about the payment of commissions to Mohler.

**{¶97}** Mr. Willan also maintains that the search warrants were overly broad and/or that the search conducted at the West Market Street office of the Evergreen companies went beyond the scope of the warrants because the affidavits and warrants pertained to the business of Evergreen Investment only, not Evergreen Homes or Evergreen Builders. The affidavits supporting these search warrants included facts to establish probable cause that Evergreen Investment was engaged in illegal activity, that its office was located in the same building as Evergreen Homes and Evergreen Builders, and that the three businesses were closely associated and owned by Mr. Willan. It further stated that Evergreen Investment was being used as a source of funding and that the affiant believed that Evergreen Homes was profitable and Evergreen Investment was insolvent at that time. It further stated information to support the affiant's belief that Evergreen Investment had become insolvent, at the expense of its creditors and for the advantage of Mr. Willan and his other companies.

**{¶98}** The warrants to search the West Market Street location did specify only "Evergreen Investment" as the business to be searched, but each warrant clearly indicated that Evergreen Investment was located in the same building as Evergreen Homes and Evergreen Builders, that the sign at the location read "Evergreen Homes," and one of the warrants included within its scope "any and all areas * * * within the physical structure of 611 W. Market Street occupied by or associated with Evergreen Investment Corporation, Evergreen Homes LLC and Evergreen Builders LLC." Moreover, each warrant authorized the search and seizure of all documentation exhibiting the names or identifiers of any of these entities or Mr. Willan himself.

**{¶99}** Mr. Willan has failed to demonstrate that the trial court erred in denying his motion to suppress evidence seized during the search of his offices. The third assignment of error is overruled.

INADMISSIBLE EVIDENCE

{¶100} Mr. Willan's fifth assignment of error is that the trial court erred in allowing the State to present evidence in each trial that was irrelevant to the offenses before the court and unduly prejudicial to him. He specifically points to evidence in his first trial about his prior conviction and his unsuccessful attempt to register as a second mortgage lender, as well as evidence in both trials that he withdrew large sums of money from his businesses and spent the funds on extravagant personal items for himself and others.

{¶101} To demonstrate reversible error, Mr. Willan must demonstrate that the evidence was wrongly admitted and that he suffered prejudice as a result. *State v. Roberts,* 156 Ohio App.3d 352, 2004-Ohio-962, at ¶14. "Prejudice occurs if there is a reasonable possibility that the error might have contributed to the conviction." *State v. Basen* (Feb. 16, 1989), 8th Dist. No. 55001, at *6, citing *State v. Cowans* (1967), 10 Ohio St.2d 96, 105. Although the evidence at issue might have contributed to the jury's assessment of the evidence pertaining to some of Mr. Willan's convictions, such as the second mortgage registration, securities fraud, and theft offenses, this Court has reversed all of those convictions. Mr. Willan has failed to argue, much less demonstrate, how any of the evidence at issue might have contributed to his convictions of false representation in the registration of securities, engaging in a pattern or corrupt activity, tampering with records, or falsification. Consequently, as he has not demonstrated prejudice, his fifth assignment of error is overruled.

CORRUPT ACTIVITY SENTENCE

{¶102} Mr. Willan's sixth assignment of error is that the trial court erred in imposing a ten-year term of incarceration under the former R.C. 2929.14(D)(3)(a) for his conviction of engaging in a pattern of corrupt activity. Pursuant to R.C. 2923.32(B)(1), Mr. Willan's

conviction of engaging in a pattern of corrupt activity was a first-degree felony because it was predicated on incidents of corrupt activity that constituted first-degree felonies. Although the State failed to prove that Mr. Willan committed the predicate offenses of aggravated theft and theft from the elderly, it did present sufficient evidence to prove that he committed three first-degree felony offenses of false representation in the registration of securities. Under the general sentencing provisions of R.C. 2929.14 at that time, if the trial court elected to or was required to impose a prison term for a conviction of a first-degree felony, it was required to impose a definite prison term of three, four, five, six, seven, eight, nine, or ten years. R.C. 2919.14(A)(1). The State persuaded the trial court, however, that it was further required by R.C. 2929.14(D)(3)(a) to impose a mandatory ten-year term of incarceration for Mr. Willan's conviction of engaging in a pattern of corrupt activity.

{¶103} At the time Mr. Willan began his alleged pattern of corrupt activity in November 2004, R.C. 2929.14(D)(3)(a) provided: [1]

> "Except when an offender commits a violation of section 2903.01 or 2907.02 of the Revised Code and the penalty imposed for the violation is life imprisonment or commits a violation of section 2903.02 of the Revised Code, if the offender commits a violation of section 2925.03 or 2925.11 of the Revised Code and that section classifies the offender as a major drug offender and requires the imposition of a ten-year prison term on the offender, if the offender commits a felony violation of section 2925.02, 2925.04, 2925.05, 2925.36, 3719.07, 3719.08, 3719.16, 3719.161, 4729.37, or 4729.61, division (C) or (D) of section 3719.172, division (C) of section 4729.51, or division (J) of section 4729.54 of the Revised Code that includes the sale, offer to sell, or possession of a schedule I or II controlled substance, with the exception of marihuana, and the court imposing sentence upon the offender finds that the offender is guilty of a specification of the type described in section 2941.1410 of the Revised Code charging that the offender is a major drug offender, *if the court imposing sentence upon an offender for a felony finds that the offender is guilty of corrupt activity with the most serious offense in the pattern of corrupt activity being a felony of the first degree*, or if the offender is guilty of an attempted violation of section

---

[1] Effective September 30, 2011, R.C. 2929.14 was amended. Language was added to this provision and it was renumbered as R.C. 2929.14(B)(3).

2907.02 of the Revised Code and, had the offender completed the violation of section 2907.02 of the Revised Code that was attempted, the offender would have been subject to a sentence of life imprisonment or life imprisonment without parole for the violation of section 2907.02 of the Revised Code, *the court shall impose upon the offender for the felony violation a ten-year prison term that cannot be reduced pursuant to section 2929.20 or Chapter 2967. or 5120. of the Revised Code.*" (Emphasis added.).

{¶104} Mr. Willan argues that R.C. 2929.14(D)(3)(a) was specifically designed to apply to major drug offenders. He contends that the trial court improperly applied the "corrupt activity" language of R.C. 2929.14(D)(3)(a) in isolation and that it ignored the reference to the specific drug offenses immediately preceding the "corrupt activity" language. He argues that the reference to "corrupt activity" in the statute cannot be construed in isolation but must be read within the context of the entire provision. See R.C. 1.42; *State ex rel. Rose v. Lorain Cty. Bd. of Elections* (2000), 90 Ohio St.3d 229, 231. Mr. Willan also asserts that, within the context of the entire provision, the statute was ambiguous as to whether the mandatory ten-year term applied to *all* convictions of engaging in a pattern of corrupt activity, or only those that involve the offenses that are explicitly identified in the statute. Thus, he argues that any ambiguity must be resolved in favor of lenity. We agree. The former R.C. 2929.14(D)(3)(a) did not unequivocally impose a mandatory 10-year prison term for any offender found guilty of the general offense of engaging in a pattern of corrupt activity set forth in R.C. 2923.32. Further, we do not discern any legislative intent to do so.

{¶105} The relevant "corrupt activity" language contained in R.C. 2929.14(D)(3)(a) appears more than halfway through this provision, after a lengthy passage of detailed language pertaining exclusively to specific drug offenses, as well as repeated references to major drug offenders, and immediately is followed by an explicit reference to certain offenses of attempted rape. Given the heavy emphasis on drug offenses and the major drug offender specification, the

mandatory ten-year term imposed by R.C. 2929.14(D)(3)(a) was associated primarily with major drug offenses. See, e.g., *State v. Moore*, 8th Dist. No. 85825, 2006-Ohio-305; *State v. Roper*, 9th Dist. No. 22102, 2005-Ohio-13; *State v. Fuller* (Sept. 30, 1998), 6th Dist. No. L-97-1426. Likewise, the mandatory ten-year term was typically imposed for corrupt activity convictions that were predicated on drug offenses. See, e.g., *State v. Baker*, 3rd Dist. No. 6-03-11, 2004-Ohio-2061; *State v. Phillips* (Dec. 13, 2001), 8th Dist. No. 79192.

{¶106} This Court was able to find only one appellate decision that upheld an application of R.C. 2929.14(D)(3)(a) to a corrupt activity conviction that was predicated on offenses other than those enumerated in the statute. See *State v. Schneider*, 8th Dist. No. 93128, 2010-Ohio-2089. Schneider argued on appeal that it was unclear whether R.C. 2929.14(D)(3)(a) applied to the general offense of engaging in a pattern of corrupt activity because the corrupt activity language did not expressly refer to R.C. 2923.32 and the corrupt activity language was preceded by a description of enumerated drug offenses. Id. at ¶17. However, the *Schneider* court addressed only the narrow argument of whether the corrupt activity language was ambiguous because it was immediately preceded by a description of drug offenses. Id. at ¶18. The *Schneider* court concluded that, because R.C. 2929.14(D)(3)(a) also identified the offense of attempted rape, it could not be interpreted as applying only to drug offenses and therefore was not ambiguous. Id.

{¶107} The *Schneider* court did not address the legal significance regarding the absence of any reference to R.C. 2923.32 in the statute. R.C. 2929.14(D)(3)(a) explicitly identified numerous drug offenses and the offense of attempted rape by their Revised Code section number, yet it did not identify the offense of engaging in a pattern of corrupt activity by its Revised Code section number, R.C. 2923.32. In light of the explicit application of the

mandatory sentence to sixteen different offenses identified by their Revised Code section number, and the failure to include any statutory reference to R.C. 2923.32, it is reasonable to infer that the mandatory ten-year prison term did not apply to *all* convictions of engaging in a pattern of corrupt activity where the most serious predicate offense was a first degree felony, but was only intended to apply to corrupt activity associated with the offenses that were explicitly enumerated in R.C. 2929.14(D)(3)(a). See *State v. Bartrum*, 121 Ohio St.3d 148, 2009-Ohio-355, at ¶16.

{¶108} Given the apparent ambiguity created by the absence of any reference to convictions under R.C. 2923.32, this Court must construe the "corrupt activity" language in the former R.C. 2929.14(D)(3)(a) in a manner that carries out the intent of the legislature in enacting it. See *Sheet Metal Workers' Internatl. Assn., Local Union No. 33 v. Gene's Refrigeration, Heating & Air Conditioning, Inc.,* 122 Ohio St.3d 248, 2009-Ohio-2747, at ¶29; *Watson v. Tax Commission* (1939), 135 Ohio St. 377, 380. To determine that intent, this Court looks to the language of the statute and the purpose that is to be accomplished by it. *Boley v. Goodyear Tire & Rubber Co.*, 125 Ohio St.3d 510, 2010-Ohio-2550, at ¶20. Although the legislature did not explicitly state its purpose for enacting R.C. 2929.14(D)(3)(a), this Court found guidance by looking at prior versions of the statute and amendments that have been made over the years.

{¶109} As originally enacted in 1996, R.C. 2929.14(D)(3)(a) specified only three drug offenses: trafficking under R.C. 2925.03, illegal manufacture of drugs under R.C. 2925.04, and possession under R.C. 2925.11, as well as certain forcible attempts to commit rape under R.C. 2907.02 and felonious sexual penetration under R.C. 2907.12. Through legislative amendments over the next four years, however, twelve more drug offenses were added to this provision, as well as a reference to the major drug offender specification under R.C. 2941.1410, each with its

Revised Code section identified. The most significant changes to R.C. 2929.14(D)(3)(a) pertained to increasing its focus on major drug offenders.

{¶110} We find further guidance by examining the statutory language of each of the enumerated offenses that were referenced in R.C. 2929.14(D)(3)(a). At the time of Mr. Willan's corrupt activity, the penalty provision of each of the enumerated offenses explicitly cross-referenced R.C. 2929.14(D)(3)(a), thereby signaling the potential for imposition of a mandatory ten-year prison term. For example, the offense of corrupting another with drugs described in R.C. 2925.02 expressly cross-referenced R.C. 2929.14(D)(3)(a) and provided that the court "shall impose" the mandatory ten-year term if the offender's violation of R.C. 2925.02 involved the sale, offer to sell, or possession of a schedule I or II controlled substance, with the exception of marijuana, and that the offender is found to be a major drug offender under the specification set forth in R.C. 2941.1410. R.C. 2925.02(E). Thus, it appears that the legislature intended to identify with particularity specific offenses that would trigger the imposition of a mandatory ten-year prison term. See, also R.C. 2925.03(C)(1)(f), (C)(2)(e), (C)(4)(g), (C)(5)(g), and (C)(6)(g); R.C. 2925.11(C)(1)(e), (C)(4)(f), (C)(5)(f), and (C)(6)(f); R.C. 2925.04(E); R.C. 2925.05(E); and R.C. 2925.36(E).

{¶111} In obvious contrast, the penalty provision for the offense of engaging in a pattern of corrupt activity then set forth in R.C. 2923.32 did not mention R.C. 2929.14(D)(3)(a), nor has it ever done so since the 1996 enactment of the mandatory ten-year term in R.C. 2929.14(D)(3)(a). It is reasonable to conclude that, if the legislature intended the mandatory ten-year term imposed by R.C. 2929.14(D)(3)(a) to apply to the general offense of engaging in a pattern of corrupt activity, it would have cross-referenced the mandatory penalty of R.C. 2929.14(D)(3)(a) in its explanation of the penalties associated with the general offense of

engaging in a pattern of corrupt activity set forth in R.C. 2923.32(B)(1), as it did in great detail for each of the specified drug offenses.

{¶112} Further evidence of the legislature's intent in employing the "corrupt activity" language in R.C. 2929.14(D)(3)(a) can be gleaned from legislative changes that have been made to R.C. 2923.32 subsequent to Mr. Willan's indictment for engaging in a pattern of corrupt activity. See *Montgomery v. John Doe 26* (2000), 141 Ohio App.3d 242, 251. Effective April 7, 2009, R.C. 2923.32 and several other criminal offenses were amended to enhance the penalties for convictions that included a human trafficking specification under R.C. 2941.1422. The human trafficking specification targets multiple felony violations of crimes including kidnapping and compelling prostitution, which sought to compel a victim or victims to engage in sexual activity for hire or to engage in a performance or modeling that is obscene, sexually oriented, or nudity oriented. See R.C. 2929.01(AAA). The human trafficking amendments explicitly applied to felony violations of certain enumerated offenses, including violations of R.C. 2923.32. See, e.g., R.C. 2929.01(AAA); R.C. 2941.1422.

{¶113} In contrast to the absence of any statutory cross-references between R.C. 2923.32 and R.C. 2929.14(D)(3)(a), the legislature clearly evidenced its intent that the mandatory prison term for human trafficking set forth in former R.C. 2929.14(D)(7) and current R.C. 2929.14(B)(7) would apply to violations of R.C. 2923.32. R.C. 2923.32 was explicitly identified by Revised Code section number in the former and current provision; R.C. 2923.32 is enumerated within the definition of human trafficking in R.C. 2929.01(AAA) and the human trafficking specification in R.C. 2941.1422; and R.C. 2923.32(B)(1) cross-references the mandatory 10-year sentence of R.C. 2929.14. R.C. 2923.32(B)(1) now provides that if an offender is convicted of engaging in a pattern of corrupt activity under R.C. 2923.32 and is also

convicted of the human trafficking specification under R.C. 2941.1422, "engaging in a pattern of corrupt activity is a felony of the first degree, and the court shall sentence the offender to a mandatory prison term as provided in [R.C. 2929.14(B)(7)[.]"

{¶114} In enacting the human trafficking amendment to R.C. 2923.32, the legislature's stated intent was "to increase the penalty for engaging in a pattern of corrupt activity if the offender is convicted of a [human trafficking] specification[.]" Am.Sub.H.B. No. 280, 2008 Ohio Session Laws. The mandatory prison term set forth in R.C. 2929.14 for a conviction of engaging in a pattern of corrupt activity under R.C. 2923.32 with a conviction of the human trafficking specification, however, is a term of "not less than five years and not greater than ten years[,]" which is less severe than the mandatory ten-year term imposed by former R.C. 2929.14(D)(3)(a). See R.C. former 2929.14(D)(7)(a)(i) and current R.C. 2929.14(B)(7)(a)(i). Consequently, given that the legislature intended to increase the penalties for corrupt activity under R.C. 2923.32 that were predicated on human trafficking, which could include the first-degree felony offense of kidnapping, it would be unreasonable to conclude that the legislature understood that such offenses under R.C. 2923.32 were already subject to a *more severe* penalty under former R.C. 2929.14(D)(3)(a) and current R.C. 2929.14(B)(3)(a).

{¶115} In an attempt to support its position that the mandatory ten-year term of former R.C. 2929.14(D)(3)(a) applied to the general offense of engaging in a pattern of corrupt activity, the State points to another sentencing provision, R.C. 2929.13(F)(10). This Court does not agree that the state's construction of R.C. 2929.14(D)(3)(a) is supported by R.C. 2929.13(F)(10), which provides now, as it did then:

> "[T]he court shall impose a prison term * * * under * * * section 2929.14 * * * and * * * shall not reduce the term[] pursuant to section 2929.20, section 2967.193, or any other provision of Chapter 2967. or Chapter 5120. of the Revised Code for * * * :

"(10) Corrupt activity in violation of section 2923.32 of the Revised Code when the most serious offense in the pattern of corrupt activity that is the basis of the offense is a felony of the first degree[.]"

{¶116} Although R.C. 2929.13(F)(10) does explicitly identify the offense of engaging in a pattern of corrupt activity by Revised Code section number, it does not refer to a mandatory ten-year term in R.C. 2929.14, nor does it cross-reference R.C. 2929.14(D)(3)(a). It merely cross-references R.C. 2929.14, a lengthy sentencing statute.

{¶117} A reasonable construction of R.C. 2929.13(F)(10) is that it applied to the general sentencing provisions of former R.C. 2929.14(A)(1). Construing the two provisions together, if an offender was convicted of engaging in a pattern of corrupt activity and the most serious predicate offense was a first-degree felony, the court was required to impose a prison term of three, four, five, six, seven, eight, nine, or ten years and that term "cannot be reduced" pursuant to R.C. 2929.20, R.C. 2967.193, or any other provision of R.C. Chapter 2967 or R.C. Chapter 5120.

{¶118} Not only does R.C. 2929.13(F)(10) fail to support the state's construction of former R.C. 2929.14(D)(3)(a), but it provides further evidence that the legislature did not intend to apply the mandatory ten-year term of R.C. 2929.14(D)(3)(a) to the general offense of engaging in a pattern of corrupt activity. This Court must construe R.C. 2929.13(F)(10) to have operative effect, rather than as unnecessary or redundant legislation. See *Ohio Bell Telephone Co. v. Antonelli* (1987), 29 Ohio St.3d 9, 11. The legislature had already provided in R.C. 2929.14(D)(3)(a) that the trial court must impose a mandatory ten-year prison sentence "that cannot be reduced pursuant to section 2929.20 or Chapter 2967. or 5120. of the Revised Code." If this language were intended to apply to the general offense of engaging in a pattern of corrupt activity, the additional language set forth in R.C. 2929.13(F)(10) that required the court to

impose a prison sentence and that it "shall not reduce the term" would be completely unnecessary.

**{¶119}** Because the language and legislative history of former R.C. 2929.14(D)(3)(a) do not clearly indicate that the mandatory ten-year term of incarceration was intended to apply to the general offense of engaging in a pattern of corrupt activity under R.C. 2923.32, this ambiguity in the statute must be resolved in favor of Mr. Willan. See *State v. Bartrum*, 121 Ohio St.3d 148, 2009-Ohio-355, at ¶18. Consequently, we conclude that the trial court erred by imposing a mandatory ten-year term under former R.C. 2929.14(D)(3)(a) for Mr. Willan's conviction of engaging in a pattern of corrupt activity based on the first-degree felony offenses of false representation in the registration of securities. Mr. Willan's sixth assignment of error is sustained.

## REMAINING ASSIGNMENTS OF ERROR

**{¶120}** Mr. Willan's remaining assignments of error need not be addressed because they have been rendered moot by our disposition of his first assignment of error. See App.R. 12(A)(1)(c).

## CONCLUSION

**{¶121}** Mr. Willan's sixth assignment of error is sustained and his first assignment of error is sustained to the extent that it challenges the sufficiency of the evidence supporting his convictions of unlicensed dealer, unregistered second mortgage lender, violating the Small Loans Act, the two counts of false representation in the registration of securities that pertained to the debt securities, securities fraud, aggravated theft, and theft from the elderly. The remainder of Mr. Willan's first assignment of error, as well as his third and fifth assignments of error are overruled. Mr. Willan's second and fourth assignments of error were not addressed because they

are moot. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

—————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
EVE V. BELFANCE
FOR THE COURT

DICKINSON, P. J.
CONCURS

CARR, J.
CONCURS IN PART, AND DISSENTS IN PART, SAYING:

{¶122} I respectfully dissent from the majority's disposition of Willan's first assignment of error, insofar as it concludes that many of his convictions were not supported by sufficient evidence. I disagree with the majority opinion for the following reasons:

Securities Sales Convictions

{¶123} The majority takes too narrow of an approach in construing the definitions of "dealer" and "salesperson" in R.C. 1707.01, which are broad enough to encompass the activities of Willan and Mohler in selling Evergreen Investment debt securities. The obvious legislative intent of the state's licensing requirements was to protect the investing public. Due to the lack of state oversight in this case, investors lost hundreds of thousands of dollars in a bad investment, without ever being adequately advised of its high risk.

{¶124} Mohler conceded that he had absolutely no training or experience in the area of securities sales or financial investment. He further testified that he did not advise investors about the high risk of these securities, nor did he assure that investors read the explanations of risk set forth in the offering circular. Willan paid him a six-figure income to serve a clerical role by assisting investors in obtaining and completing the necessary paperwork to purchase the debt certificates. Because Willan paid him on a commission basis, however, Mohler was encouraged to bring in a high volume of sales and did, in fact, raise millions of dollars for Willan's Evergreen Investment. Although these securities sales funded the growth of Willan's business with many investors' life savings, Mohler had not been trained to advise them or ensure that they read the offering circular, nor were his activities overseen by state regulators.

## Second Mortgage Convictions

**{¶125}** Willan's second mortgage business did not fall outside the state's licensing requirements for second mortgage lenders simply because he did not actually advance money to the buyers of Evergreen's rehabbed homes. Aside from lacking an actual advancement of cash, these transactions had the same effect as second mortgage loans. Willan advanced homes to buyers who had not yet paid the full purchase price; he allowed them to pay the balance due over time, at a significant rate of interest; and he encumbered their homes with a second mortgage. The fact that there was no technical exchange of money was inconsequential to the legal effect of these transactions.

## Small Loan Convictions

**{¶126}** I would not analyze the level of culpability required for a violation of R.C. 1321.02 because Willan conceded at trial and on appeal that this is a strict liability offense. Moreover, I am not persuaded by the merits of the majority's strict liability analysis.

## Securities Registration Convictions

**{¶127}** I would affirm Willan's two convictions of making false representations in the registration of the Evergreen Investment debt securities. Because he was required to file the Evergreen Investment offering circular for approval by the Division of Securities when he registered each offering of debt securities, all representations in the offering circular were material and relevant to the registration process, including his false representation that no commissions would be paid in connection with the sale of the securities.

## Theft Convictions

**{¶128}** Although the state focused on the offering circular's misrepresentation about the payment of commissions as one act of deception by Willan, it also focused on the his

representation on the back of each certificate, a boldfaced "GUARANTY OF PAYMENT," which explained that Evergreen Homes "unconditionally guarantees" payment of the principal and interest due on each certificate. Although the 20-page offering circular included further explanations that the certificates were not insured or federally guaranteed, but were dependent upon the financial liquidity of the Evergreen companies, many of the investors testified that they did not remember seeing or did not read the offering circular. Because Mohler was not a trained financial advisor, he did not fully explain the risk to each investor, nor did he assure that each read the offering circular before purchasing certificates. The state's evidence was sufficient to establish that at least some of the investors, several of whom were elderly, were deceived into investing thousands of dollars in Evergreen Investment debt certificates that were far more risky that they had been led to believe and, as a result, they lost their investments.

{¶129} For these reasons, I believe that all of Willan's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence and would overrule his first assignment of error. I concur in the majority's disposition of Willan's sixth assignment of error and would overrule his remaining assignments of error.


APPEARANCES:

WILLIAM T. WHITAKER and ANDREA L. WHITAKER, Attorneys at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and COLLEEN SIMS and RICHARD HOENIGMAN, Assistant Prosecuting Attorneys, for Appellee.

BRAD TAMMARO, Special Prosecuting Attorney, for Appellee.